**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Saul SIEGEL, Defendant-Appellant.**

**No. 78–5006.**

United States Court of Appeals, Fifth Circuit.

Jan. 11, 1979.

Rehearing Denied Feb. 13, 1979.

Henry Gonzalez, Miami, Fla., for defendant-appellant.

John P. Volz, U. S. Atty., Ernest C. Chen, Asst. U. S. Atty., New Orleans, La., for plaintiff-appellee.

Before GOLDBERG, Circuit Judge, SKELTON *, Senior Judge, and FAY, Circuit Judge.

FAY, Circuit Judge:

On June 10, 1977, appellant, Saul Siegel, was found guilty of violating 18 U.S.C. § 2314[1] and on November 16, 1977 he was sentenced to a prison term of eighteen months. Siegel raises the following points on appeal: 1) that the evidence was insufficient to sustain a conviction, 2) that the questioning by the trial judge was prejudicial, 3) that the prosecutor made prejudicial statements expressing his personal beliefs regarding the credibility of appellant, 4) that the trial judge incorrectly gave instructions, unrequested by appellant, concerning impeachment of witnesses which was immediately followed by a prejudicial instruction regarding a defendant testifying on his behalf, 5) that it was error to refuse appellant a continuance in order to secure a witness, and 6) that the indictment was improper because it was based on hearsay evidence and because the testimony of the Government's sole witness was not transcribed. Concluding that appellant received a fair trial, we affirm the conviction.

---

* Senior Judge of the United States Court of Claims, sitting by designation.

1.  18 U.S.C. § 2314 reads in relevant part:

    Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transports or causes to be transported, or induces any person to travel in, or to be transported in interstate commerce in the execution or concealment of a scheme or artifice to defraud that person of money or property having a value of $5,000 or more . . .

    Shall be fined not more than $10,000 or imprisoned not more than ten years, or both. This section shall not apply to any falsely made, forged, altered, counterfeited or spurious representation of an obligation or other security of the United States, or of an obligation, bond, certificate, security, treasury note, bill, promise to pay or bank note issued by any foreign government or by a bank or corporation of any foreign country.

## FACTS

Dale and Darlene Johnston needed capital to buy machinery to increase production and to retire old debts of their coal mining business in Oklahoma, D & D Mining Company. Dale Johnston mentioned his financial difficulties to a coal broker named Joseph Eberhard who in turn contacted Saul Siegel in early 1976 because Siegel had expressed an interest in any sound investments that Eberhard might find in his travels. Eberhard testified that Siegel wanted Johnston and Eberhard to travel to New Orleans with D & D Company's books so that appellant could look over the books to decide whether to help Johnston obtain a $100,000 loan. On February 25, 1976, Dale Johnston traveled from Oklahoma to Arkansas to meet Eberhard for their journey to New Orleans. When Johnston and Eberhard met appellant in New Orleans, they discussed the financial position of D & D Company. Appellant told Johnston that in return for arranging the $100,000 loan for D & D Company, the Johnstons were to make Siegel's son 50% owner in a corporation to be formed by the Johnstons. In order to carry out the terms of the agreement, the Johnstons' attorney formed the D & D Mining Corporation with the 50–50 stock arrangement.

The $100,000 loan was arranged by Larry Ott, executive vice-president of the Ponchartrain State Bank. This loan was secured by heavy equipment which the Johnstons owned free and clear of any liens. The value of this equipment exceeded the amount of the loan plus interest. In addition, this loan was guaranteed by both appellant and the Johnstons.

The bank account that was set up for D & D Mining Corporation with the Pontchartrain State Bank listed appellant as the only person authorized to withdraw funds. Such money as went to the Johnstons was sent by check and wire. Appellant alleged that the Johnstons deposited the money

sent by him in their personal account and that the money was being used to pay off some old debts of D & D Mining Company. There is evidence in the record that at the time appellant signed the $100,000 note, he owed over $750,000.

Before the account for D & D Mining Corporation was opened in Ponchartrain State Bank on March 17, 1976, appellant had withdrawn, through multiple transactions, over $58,000. Of the $58,000 withdrawn before March 17th, $20,000 was in the form of a wire sent by Siegel to D & D Mining Corporation on March 10, 1976. Appellant retained the $38,000 he did not send to D & D Mining. On March 17, 1976, the day the proceeds of the $100,000 loan were credited to the account of D & D Mining, Siegel withdrew over $36,000, of which only $20,000 were wired to D & D Mining. Another $6,900 was sent by Siegel to D & D Mining some time after March 17th. In addition, $3,300 went to the Prudential Bank of New Zealand for credit to the account of Murray Directors Affiliates to pay a compensating balance at the Ponchartrain State Bank.[2] Three additional checks totalling $28,000 were sent by Siegel to D & D Mining, but were returned for insufficient funds. In sum, D & D Mining received a total of $46,900 from Siegel. Thus, appellant retained the difference between $100,000 and $50,200 ($46,900 which went to D & D Mining and $3,300 which went to pay for the CD). Appellant had also sent a piece of equipment to D & D Mining Corporation which he claimed was valuable and which he claimed further proved his good intentions toward D & D Mining Corporation. Siegel appeals the jury's verdict finding him guilty of inducing a person to travel in interstate commerce in furtherance of a scheme to defraud by means of false and fraudulent pretenses, representations and promises, in violation of 18 U.S.C. § 2314.

## I. SUFFICIENCY OF EVIDENCE

■ It is settled law in this Circuit that where, as was the case here, a defendant

---

**2.** Since the bank did not have the funds readily available to loan $100,000, the money would have to come from another source and remain in the bank so that the loan could be given to D

& D Mining. Murray Directors Affiliates, a group of investors, wired $110,000 to Ponchartrain State Bank as compensating balance for the loan to D & D Mining.

puts on evidence after moving for acquittal under F.R.Crim.P. 29(a), he waives objection to the denial of that motion unless he renews his motion at the close of all the evidence. *United States v. Phipps,* 543 F.2d 576, 577 (5th Cir. 1976), *cert. denied,* 429 U.S. 1110, 97 S.Ct. 1146, 51 L.Ed.2d 564 (1977); *United States v. Perez,* 526 F.2d 859 (5th Cir.), *cert. denied,* 429 U.S. 846, 97 S.Ct. 129, 50 L.Ed.2d 118 (1976); *United States v. Edwards,* 488 F.2d 1154 (5th Cir. 1974). In *Phipps* this Court stated that an exception to the above rule "has been suggested where to deny the appeal would further a manifest miscarriage of justice." 543 F.2d at 577. Even under the suggested *Phipps* test, Siegel's appeal must be denied as we do not believe this denial would further a manifest miscarriage of justice. On the contrary, the record indicates that there was sufficient evidence from which the jury could have concluded that Siegel induced Johnston and Eberhard to travel in interstate commerce in furtherance of a scheme to defraud as set out in 18 U.S.C. § 2314.

■ There is clear evidence in the record that the reason Johnston and Eberhard traveled to New Orleans was to discuss the Johnstons' financial situation regarding D & D Mining Company for purposes of obtaining a loan for that business. At the time the loan was obtained, Siegel was heavily in debt, owing approximately $750,-000. Before the proceeds of the $100,000 loan were credited to D & D Mining Corporation, Siegel had withdrawn over $58,000 from that account.[3] Out of the $100,000, the Johnstons received only $46,900.[4] Appellant began withdrawing loan proceeds before the proceeds were even actually deposited in Ponchartrain State Bank. Surely the jury could have concluded that appellant's financial situation at the time Johnston and Eberhard traveled to New Orleans, coupled with the speedy withdrawals by Siegel of these funds, was evidence of

Siegel's planned intent to defraud the Johnstons of the money. Very often conduct is the only evidence of subjective intent. These deeds speak rather loudly.

## II. CONDUCT OF THE TRIAL JUDGE

■ The appellant complains that the following questions by Chief Judge Frederick J. R. Heebe were highly prejudicial and must have had an adverse impact on the jury:

THE COURT: Mr. Siegel, let me ask you this question: What did you do with all of the funds that you drew on the corporation's account to your own, to yourself?

THE WITNESS: I used them for my own account, sir, my other businesses.

THE COURT: Did you have authority to do that?

THE WITNESS: Yes, I did.

THE COURT: Listen to me carefully: You had authority, we all know, to write checks?

THE WITNESS: Right.

THE COURT: Did you have authority to write checks for the purpose of using it on your own personal expenses?

THE WITNESS: I don't know, sir, I don't know the law.

THE COURT: You don't know that?

THE WITNESS: No, I don't.

THE COURT: Then, why did you write the checks, these checks to yourself in the amount of something over $30,000?

THE WITNESS: Because, sir, I could put it back into the company; lots of times there are companies that need funds, and I put them in directly.

THE COURT: Have you put it back in?

THE WITNESS: Not yet, sir.

MR. GONZALEZ: Could we approach the Bench a moment?

---

**3.** On March 17, 1976, the day the proceeds were credited to D & D Mining Corporation, Siegel withdrew another $36,000.

**4.** The $46,900 was sent to D & D Mining Corporation as follows: March 10, 1976—$20,000; March 17, 1976—$20,000; two other wire

transfers were made after March 17, one for $3,900 and the other for $3,000. Three personal checks totalling $28,000 were sent by Siegel to D & D Mining Corporation but these were returned for insufficient funds by the bank.

(The following proceedings were had at the Bench, outside the hearing of the jury or the witness.)

MR. GONZALEZ: At the [sic] time, I would like to move for a mistrial. (T. 241–43)

In reviewing the record we find the experienced trial judge made every effort to see that Siegel had a fair trial. By these questions the trial judge was merely trying to ascertain whether appellant had authority to withdraw the funds and to determine what happened to the funds after they were withdrawn. Furthermore, in the jury instructions the trial judge cautioned the jury to disregard comments by the judge and not to draw any inferences from the judge's questions. The conduct of the trial judge in this case by asking a few questions to clarify matters, coupled with his instructions to the jury not to draw inferences from his questioning, is not comparable to the conduct condemned in *United States v. Hoker*, 483 F.2d 359 (5th Cir. 1973). It is well settled that a trial judge must use caution in questioning a witness because his position as judge carries overpowering weight before a jury. However, we do not feel this trial judge was overzealous or that his impartial attitude is open to serious question. In *Hoker*, the number of questions by the trial judge was somewhere around one hundred and fifty-three. But it was "the tenor of the court's questions rather than the bare number" which this Court felt was the important factor. In this case neither the tenor nor the number of questions is similar to *Hoker*. We believe the situation here falls within *United States v. James*, 528 F.2d 999 (5th Cir. 1976), *cert. denied*, 429 U.S. 959, 97 S.Ct. 382, 50 L.Ed.2d 326 (1977) where the questions complained of were intended to clarify rather than express doubts as to the witness's credibility.

■ The questions posed by Chief Judge Heebe "indicated only a fair and objective effort to clarify the testimony and expedite the trial." 528 F.2d at 1022. A trial judge may elicit further information from witnesses if he believes this would be of benefit to the jury provided that he makes it clear that all matters of fact are for the jury to resolve. In considering the record as a whole, we find no merit in appellant's attack on the conduct of the trial judge. *See United States v. Gower*, 447 F.2d 187, 191 (5th Cir.), *cert. denied*, 404 U.S. 850, 92 S.Ct. 84, 30 L.Ed.2d 88 (1971).

## III. CONDUCT OF THE PROSECUTOR

■ As we have stated repeatedly, the purpose of closing arguments is to assist the jury in analyzing, evaluating and applying the evidence. It is not the time for an attorney to express his personal opinion concerning the merits of the case.

The distinction between the earnest implorings of an advocate of conclusions the jury should draw from evidence and, on the other hand, the statement of counsel of what he believes, personally, about the case, a witness in the case, or any other issue is often not observed. The courts require adherence to the proper side of the line whenever the issue is presented, and such issues usually involve transgressions by prosecuting attorneys. That is as it should be, for chances of prejudice are greater when prosecutors transgress. The prosecutor is not just a retained attorney; he is a public official occupying an exalted station.

*United States v. Morris*, 568 F.2d 396, 402 (5th Cir. 1978).[5]

---

5. The comment by the prosecutor which appellant complains of reads in relevant part:

MR. CHEN: . . . Dale Johnston and Darlene Johnston needed money to stay in the coal mining business. That was the inducement for them to travel across state lines in interstate commerce.

And was the defendant truthful? Was he honest? Did he tell Johnston or Eberhard, or Ott, what he really intended to do? No. And you heard it not only from witnesses, but from these solid documentary evidence.

And I am going to refer you to these on this charge. Take a look at these, the defendant took the stand and he told you that, "Look, when I found out what D & D Mining was doing with the money—I had already sent $40,000.00," and he said that they were

Although we would in no way condone the actions of a prosecutor stating that appellant in his opinion had lied, we believe this prosecutor merely intended to argue that appellant's statements were not supported by the evidence. There was no inference that the prosecutor had private information supporting his belief that appellant had lied and no suggestion was made by the prosecutor that he had such private information.

Furthermore, even if the prosecutor's statements could have been characterized as error, they would not have amounted to reversible error. "Error must be regarded as harmless if, upon an examination of the entire record, substantial prejudice to the defendant does not appear." *United States v. Morris*, 568 F.2d at 402, *citing Berger v. United States*, 295 U.S. 78, 82, 55 S.Ct. 629, 79 L.Ed. 1314 (1935). The trial court in this case admonished the jury that the comments of the attorneys were not to be construed as evidence. Under these circumstances, appellant's rights were sufficiently protected. *See Chapman v. California*, 386 U.S. 18, 23–26, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

We find the other comment complained of by appellant was also harmless. Siegel complains that during a bench conference defense attorneys accused the government of concealing *Brady* material and the prosecutor shook his head and verbally characterized this accusation as a lie. After the trial, the judge conducted an evidentiary hearing and determined these comments by the prosecutor were not heard by the jury. We do not feel the situation described above prejudiced appellant in any manner. It has not been shown that the trial judge's determination that the jury did not hear the prosecutor was erroneous. The trial judge is better able to determine whether such things as the size of the courtroom and the volume of the prosecutor's voice would have enabled the jury to hear the prosecutor's remarks. Since the trial judge found the jury did not hear the remarks, and since appellant has not shown that the trial judge erred in making this determination, we sustain the trial judge's ruling.

## IV. RESTRICTION OF CROSS–EXAMINATION

In this case the trial judge first prevented appellant's attorney from cross-examining a witness on whether civil litigation was pending between Ponchartrain State Bank and any party regarding the $100,000 loan. Later, the trial judge reversed himself and afforded counsel for Siegel full opportunity to cover that area.

Although the right of cross-examination is absolute, it is within the sound discretion of the trial court to place restrictions on the scope of cross-examination. *See Alford v. United States*, 282 U.S. 687, 694, 51 S.Ct. 218, 75 L.Ed. 624 (1931); *United States v. Alonzo*, 571 F.2d 1384, 1388 (5th Cir. 1978).

---

paying too many old debts, and that he cut off the proceeds, the balance of the loan to them.

Now, just because a man says that, that doesn't make it true, and in this case he lied. He lied because—

MR. GONZALES: Objection, if your Honor please, and I move for a mistrial. The prosecution cannot give its own opinion, and I move for a mistrial. He is expressing his own opinion, and it is objectionable.

THE COURT: The motion is denied.

MR. CHEN: I am telling you now, it is not my opinion. This tells us it is so, Government Exhibit Number 18 (indicating), it tells us that Saul Siegel lied when he took the stand.

Government Exhibit Number 17 tells us Saul Siegel lied when he was on the witness stand.

Government Exhibit Number 16 tells us that Saul Siegel lied when he took the stand.

And how do you know that? Look at the dates (indicating on chart), if what Siegel said were true that he stopped sending any more money to the Johnstons or to D & D Mining Corporation in October, then he couldn't have known that before the 17th, because on March 17th he did send $20,000. So whatever he told you he knew, he had to come into that knowledge after March 17th.

But look at these exhibits when you go into the deliberation room, what had happened to the money ahead of time, before he ever found out what D & D Company had done or may have done, or, in fact, did. Record at 278–79.

Since the trial judge has the discretion to place restrictions on cross-examination, and since in this case Chief Judge Heebe reversed himself and allowed appellant's counsel full opportunity to pursue this matter, we find no abuse of discretion by the trial judge.

## V. CONTINUANCE

Appellant also complains that the trial judge did not grant a continuance in order to bring Milton Kafka, an attorney who handled appellant's civil problems, to testify and that this constituted error. Generally, the person moving for a continuance must show: that due diligence had been exercised to obtain the attendance of the witness; that substantial favorable testimony would be tendered by the witness; that the witness was available and willing to testify; that the denial of a continuance would materially prejudice the defendant. *United States v. Smith*, 548 F.2d 545, 547–48 (5th Cir.), *cert. denied*, 431 U.S. 959, 97 S.Ct. 2685, 53 L.Ed.2d 277 (1977).

We do not feel appellant has satisfied the test set out in *Smith*. For instance, appellant did not show due diligence in securing Kafka as a witness since it appears Kafka was not subpoenaed by Siegel's attorney; there was no showing that Kafka was either available or willing to testify; and we cannot say the denial of the continuance materially prejudiced Siegel since no showing was made that Kafka's testimony would have been favorable or that, even if the testimony would have been favorable, it would not have been cumulative.

Again, a motion for continuance is addressed to the sound discretion of the trial court and its ruling will not be disturbed on appeal unless there is a showing that there has been an abuse of that discretion. *Avery v. Alabama*, 308 U.S. 444, 60 S.Ct. 321, 84 L.Ed. 377 (1940).

## VI. VALIDITY OF INDICTMENT

There is no merit to appellant's contention that the trial court erred in denying the motion to dismiss for failure by the government to transcribe the testimony of an FBI agent before the grand jury. F.R.Crim.P. 6(d) permits, but does not require, stenographic transcription of grand jury testimony. *See United States v. Harper*, 432 F.2d 100, 102 (5th Cir. 1970).

The contention that the indictment was constitutionally invalid because it was based on hearsay testimony is also meritless. This Court held in *United States v. Cruz*, 478 F.2d 408, 411 (5th Cir.), *cert. denied*, 414 U.S. 910, 94 S.Ct. 259, 38 L.Ed.2d 148 (1973) that the presentation of hearsay testimony of an investigating officer in lieu of readily available testimony by direct witness is not preferred but it is neither unconstitutional nor inherently wrong.

## VII. CONCLUSION

Finding a fair trial, free of reversible error and free of prejudice, we AFFIRM.