406 S.E.2d 781

Yvette BLANKENSHIP

v.

**GENERAL MOTORS CORPORATION.**

No. 19949.

Supreme Court of Appeals of
West Virginia.

Submitted May 7, 1991.

Decided June 27, 1991.

Paul C. Sullivan, Sullivan & Sullivan, Cumberland, Md., Staggers & Webb, Keyser, for plaintiff.

G.W. Lavender III, Meyer, Darragh, Buckler, Bebenek, Eck & Hall, Charleston, for amicus Product Liability Advisory Council, Inc.

Edward W. Rugeley, Jr., Gale R. Lea, Jackson & Kelly, Charleston, Joseph G. Finnerty, Jr., Michael S. Barranco, Piper & Marbury, Baltimore, Md., for defendant.

NEELY, Justice:

■ In this case the United States District Court for the District of Maryland has certified the following question to us:

Does a complaint against the seller of a motor vehicle state a cause of action under West Virginia law if the complaint does not allege that a vehicle defect *caused* a collision, but does allege that the injuries sustained by the occupant as a result of the collision were *enhanced* by a design defect in the vehicle?

We answer the certified question in the affirmative, and like all of our sister states,

we now explicitly adopt the "crashworthiness doctrine." [1]

There is an embarrassment of riches in reported cases and law review articles on the subject of crashworthiness. A collection of the cases and a summary of the scholarly literature can be found in B. Levenstram and D.J. Lapp, *Plaintiff's Burden of Proving Enhanced Injury in Crashworthiness Cases: A Clash Worthy of Analysis*, 38 DePaul Law Review 55 (1989). According to Mr. Levenstram and Mr. Lapp, as of the publication of their article, there were but two jurisdictions in the United States that still failed to recognize the doctrine of crashworthiness, namely Mississippi and West Virginia. As it turns out, however, the old Mississippi case of *Walton v. Chrysler Motor Corp.*, 229 So.2d 568 (Miss.1969), and cases based on *Walton*, were overruled in 1985 by *Toliver v. General Motors Corp.*, 482 So.2d 213 (Miss.1985). That has left in doubt, then, only West Virginia, and that doubt is based upon the federal case of *McClung v. Ford Motor Co.*, 333 F.Supp. 17 (1971), *aff'd*, 472 F.2d 240 (4th Cir.1973), decided immediately before this Court's wholesale updating of our tort law in the 1970's.

Obviously, West Virginia's personal injury law has moved light years away from the doctrines applied in *McClung, supra,* as evidenced by cases like *Dawson v. Canteen Corp.*, 158 W.Va. 516, 212 S.E.2d 82 (1975) (abolishing the requirement of privity in warranty actions), *Morningstar v. Black & Decker Mfg.*, 162 W.Va. 857, 253 S.E.2d 666 (1979) (developing a product liability rule permitting recovery where a defective product causes personal injury), and *Bradley v. Appalachian Power*, 163 W.Va. 332, 256 S.E.2d 879 (1979) (abolishing contributory negligence as an absolute bar to recovery in tort). Thus, it is astounding

1. The term "crashworthiness" is defined in the Motor Vehicle Information and Cost Savings Act, 15 U.S.C. §§ 1901 *et seq.* (1982 and 1990 Supp.), as "the protection that a passenger motor vehicle affords its passengers against personal injury or death as a result of a motor vehicle accident." *Ibid* § 1901(14) (1982 & 1990 Supp.). For judicial definitions of the term, see *Dreisonstok v. Volkswagenwerk, A. G.*, 489 F.2d 1066, 1069 n. 3 (4th Cir.1974).

that the issue before us today did not arrive sooner.

In the excellent briefs of General Motors and amicus, Product Liability Advisory Council, Inc., numerous issues concerning the wisdom of applying product liability law to vehicle crashworthiness problems have been raised. For example, both the defendant and amicus point out that because, under *Wright v. Hanley*, 182 W.Va. 334, 387 S.E.2d 801 (1989), a car's occupants' failure to use available seat belts cannot be introduced as contributory negligence in West Virginia, it would be unfair to allow an action for crashworthiness or "second collision." General Motors argues:

> It would be quite ironic if this court were to refuse to impose upon the passenger the duty to minimize his injuries in a collision by wearing his seat belt but, nevertheless, to impose upon the manufacturer the duty to minimize the passenger's injuries through the adoption of the crashworthiness theory of liability.

Defendant's brief, pp. 20–21. However, we did not hold in *Hanley* that failure to use an available seat belt would not be comparative contributory negligence in a crashworthiness case.

And, in a similar vein, both the defendant and amicus argue that allowing crashworthiness lawsuits invites juries to second-guess the safety standards promulgated by

the National Highway Traffic Safety Administration.[2] Thus, under the common theories of crashworthiness, defendant and amicus argue, different juries will reach different conclusions about the "reasonableness" of safety features, leaving manufacturers in the unenviable position of being unable to predict what juries will deem a "defective product [that] causes personal injury." *Morningstar, supra.* Furthermore, defendant and amicus argue, juries may find designs approved by federal regulators "defective," giving the whole regulatory effort a certain *Alice in Wonderland* quality.

In all of these regards the manufacturers and amicus have strong arguments. Nonetheless, West Virginia is a small rural state with .66 percent of the population of the United States. Although some members of this Court have reservations about the wisdom of many aspects of tort law,[3] as a court we are utterly powerless to make the *overall* tort system for cases arising in interstate commerce more rational: Nothing that we do will have any impact whatsoever on the set of economic trade-offs that occur in the *national* economy. And, ironically, trying unilaterally to make the American tort system more rational through being uniquely responsible in West Virginia will only punish our residents severely without, in any regard, improving the system for anyone else.[4]

**2.** *See* 49 C.F.R., Part 571 setting forth applicable federal motor vehicle standards. Federal motor vehicle safety standards are promulgated by the National Highway Traffic Safety Administration following publication in the federal register and after a period allowed for comments during which anyone, including consumer advocates, may make suggestions. Anyone may petition the National Highway Traffic Safety Administration to make specific rules on safety standards and the administration must consider and rule on such petitions. The administration also polices the "crashworthiness" of vehicles already in public use through its office of defects investigation. Furthermore, manufacturers have statutory obligations to initiate recalls even without being urged by the administration whenever a "safety related defect" appears. *See* Sklaren, *The Effect of Current NHTSA Regulations and Enforcement Policy on Products Liabil-*

*ity in the Motor Vehicle Industry,* 21 ABA, Tort & Ins. L.J., No. 3,464 (1986) and sources cited therein.

**3.** *See* e.g., McHugh J. dissenting in *Roberts v. Stevens Clinic Hospital,* 176 W.Va. 492, 345 S.E.2d 791, 804, n. 15 (1986).

**4.** The greatest problem with product liability emerges from its chilling effect on research and development. *See* P.W. Huber, *Liability: The Legal Revolution and Its Consequences,* Basic Books (New York, 1988). A study by the Conference Board, a business-oriented foundation, discovered that most large companies with established products consider product liability a minor annoyance. Smaller companies, and companies engaged in extensive research into new products, however, find that product liability law has a chilling effect on research, innovation and competition. *See* N. Weber, *Product*

When the Supreme Court of Mississippi—the next to last state court to adopt the "crashworthiness" doctrine—overruled the *Walton* case, *supra,* (which had denied a cause of action in Mississippi for lack of crashworthiness), the Mississippi court summarized their reasons for adopting the crashworthiness doctrine as follows:

> The rationale for the imposition of this absolute liability is two-fold: to shift the cost of injuries from the public to the manufacturer, *Greenman v. Yuba Power Products, Inc.,* 59 Cal.2d 57, 63, 27 Cal.Rptr. 697, 701, 377 P.2d 897, 901 (1962); and to assist the plaintiff in establishing what would otherwise be a near-impossible burden of proof. J.W. Wade, *On the Nature of Strict Tort Liability for Products,* 44 Miss.L.J. 825, 826 (1973). The first part of the rationale represents a policy decision. As Justice Traynor stated in *Greenman:*
>
> "The purpose of such liability is to insure that the costs of injuries resulting from defective products are borne by the manufacturers that put such products on the market rather than by the injured persons who are powerless to protect themselves." 59 Cal. at 63, 27 Cal.Rptr. at 701, 377 P.2d at 901. The second part of the rationale assists the plaintiff who could not, otherwise, satisfy his burden of showing how the product became defective. As Dean Wade has noted:

> It is often difficult, or even impossible to prove negligence on the part of the manufacturer or supplier. True, res ipsa loquitur often comes to the aid of the injured party. But it is normally regarded as a form of circumstantial evidence, and this means that there must be a logical inference of negligence which is sufficiently strong to let the case go to the jury. This is often not present, and strict liability eliminates the need of proof. Wade, *Strict Tort Liability, supra.*

*Toliver v. General Motors, supra,* at 216.

What is obvious from the Mississippi court's discussion is that product liability is concerned with *spreading the cost of inevitable accidents*[5]. Inherent in this cost-spreading function is the collection of what amounts to insurance premiums from all the purchasers of products, and the purchase by manufacturers of commercial insurance or the creation of self insurance funds.

The defendant before us, General Motors, is the largest producer of automobiles in the world. In light of the fact that all of our sister states have adopted a cause of action for lack of crashworthiness, General Motors is *already* collecting a product liability premium every time it sells a car anywhere in the world, including West Virginia. *See* "Product Liability: The Corpo-

---

*Liability: The Corporate Response,* Conference Board Report Number 893 (New York, 1987), and E.P. McGuire, *The Impact of Product Liability,* Conference Board Report Number 908 (New York, 1988).

Because of liability risks, only one company, Merck Sharp & Dohme, is willing to continue manufacturing the vaccine for measles, mumps and rubella. Football helmets now cost $150, half of which goes to "crashworthiness" product liability insurance premiums. Thus, the ultimate cost of product liability is not usually seen in the closing of existing factories, but rather in research and development *not* pursued, new technologies *not* developed, new products *not* introduced, new factories *not* built, and new jobs *not* created. In a survey of CEO's, the Conference Board found that worry about potential liability lawsuits caused 47% of firms surveyed to discontinue one or more product lines. What's more, 25% stopped certain product research and development, and 39% decided against coming out with a new product. E.P.

McGuire, *The Impact of Product Liability,* Conference Board Report Number 908, *supra,* at p. 28, Table 30 (New York, 1988).

**5.** For a synoptic view of the intellectual history of product liability and related theories of recovery in personal injury cases, *see* F. James, Jr., *Last Clear Chance: A Transitional Doctrine,* 47 Yale L.J. 704 (1938); F. James, Jr., *Contribution Among Joint Tortfeasors: A Pragmatic Criticism,* 54 Harv.L.Rev. 1156 (1941); F. Kessler, *Contracts of Adhesion—Some Thoughts About Freedom of Contract,* 43 Colum.L.Rev. 629 (1943); W. Prosser, *The Assault Upon the Citadel: Strict Liability to the Consumer,* 69 Yale L.J. 1099 (1960); W. Prosser, *The Fall of the Citadel: Strict Liability to the Consumer,* 50 Minn.L.Rev. 791 (1966); W. Keeton, *The Meaning of Defect in Products Liability Law—A Review of Basic Principles,* 45 Mo.L.Rev. 579 (1980); G. Priest, *The Invention of Enterprise Liability: A Critical History of the Intellectual Foundations of Modern Tort Law,* 14 J.Leg.Stud. 461 (1985).

rate Response," *op. cit. supra* note 4. West Virginians, then, are already paying the product liability insurance premium when they buy a General Motors car, so this Court would be both foolish and irresponsible if we held that while West Virginians must pay the premiums, West Virginians can't collect the insurance after they're injured.[6]

Already as early as *Dawson v. Canteen Corp.*, 158 W.Va. 516, 212 S.E.2d 82 (1975) we recognized the peculiarly American system of fifty uncoordinated, separate schemes of tort law coexisting within one industrial nation. Thus, in abolishing West Virginia's rule requiring privity of contract to enforce product warranties, we said:

> For many years West Virginians suffering injuries as the result of defective products have been unable to recover against defendant manufacturers, wholesalers, or retailers for breach of warranty unless they stood in privity of contract with the defendant. At the same time West Virginia manufacturers, wholesalers and retailers selling products nationally have been exposed to extensive liability for defective products manufactured in this State and sold elsewhere because the majority of American jurisdictions have abolished privity as a requirement in warranty actions.

*Dawson*, 158 W.Va. at 517, 212 S.E.2d at 82.

■ As a fall back position in the case before us, General Motors urges that, should we adopt the doctrine of crashworthiness, we simultaneously adopt the burden of proof rule announced in *Huddell v.*

*Levin*, 537 F.2d 726 (3rd Cir.1976). Under *Huddell* (and cases that follow *Huddell's* approach)[7], the plaintiff must prove that the product defect was the cause of a particular enhanced or aggravated injury that plaintiff suffered. To meet the *Huddell* burden the plaintiff must show what injuries would have resulted from the collision in the absence of the defect, so that the plaintiff bears the heavy burden of distinguishing between first and second collision injuries. In this regard the court in *Huddell* said:

> First, in establishing that the design in question was defective, the plaintiff must offer proof of an alternative, safer design, practicable under the circumstances.... Second, the plaintiff must offer proof of what injuries, if any, would have resulted had the alternative safer design been used.... Third, as a corollary to the second aspect of proof, the plaintiff must offer some method of establishing the extent of enhanced injuries attributable to the defective design....

*Huddell* at 737–38.

*Huddell* rejected the analysis used in concurrent tortfeasor actions as inapplicable to crashworthiness cases. *Id.* at 738. The *Huddell* court reasoned that concurrent tortfeasor principles are inapposite because the alleged tortfeasors in a crashworthiness case could not combine contemporaneously to cause the injuries. Therefore, the theory against the manufacturer in a crashworthiness case is one of enhanced injury; analogies "to concurrent actions

---

**6.** We note that even in an oligopoly, like the automobile industry, there is an industry-wide downward sloping demand curve. Thus, any product liability insurance premium—regardless of how actuarially sound—will have some negative effect on the total volume of cars sold because, as prices rise, fewer consumers are willing to buy at the new higher prices. *See, The New Palgrave: A Dictionary of Economics,* J. Eatwell, M. Milgate and P. Newman, editors, The MacMillan Press Limited (London, 1987) Vol. 3, "Oligopoly." Thus, in terms of overall national employment, product liability law is not entirely benign, but trade-offs between employment opportunities in Michigan and the compensation of accident victims here in West Virginia are entirely beyond the capacity of this Court.

**7.** *See, e.g., Caiazzo v. Volkswagenwerk A.G.,* 647 F.2d 241 (2nd Cir.1981); *Stonehocker v. General Motors Corp.,* 587 F.2d 151 (4th Cir.1978); *Jeng v. Witters,* 452 F.Supp. 1349 (N.D.Pa.1978), *aff'd without opinion,* 591 F.2d 1335 (3rd Cir.1979); *Yetter v. Rajeski,* 364 F.Supp. 105 (D.N.J.1973).

combining to cause a single impact are simply not applicable." *Id.* at 738.

The *Huddell* standard makes a great deal of sense and, perhaps, it should be the national standard in all crashworthiness cases. But it isn't. Therefore we reject the *Huddell* standard because West Virginians are not going to pay product liability insurance premiums so that all the residents of the 10th Circuit, where *Fox v. Ford Motor Co.*, 575 F.2d 774 (10th Cir. 1978) was decided, can collect the benefits. The more liberal rule announced in *Fox* (and cases that follow *Fox*) [8] is that the plaintiff need show only a defect that was *a* factor in causing some aspect of the plaintiff's harm. Once the plaintiff has made this *prima facie* showing, the manufacturer can then limit its liability if it can show that the plaintiff's injuries are capable of apportionment between the first and second collisions. Therefore, under this more liberal standard, the burden is upon the manufacturer to make the allocation. We adopt this rule.

■■■ Because this is a certified question, we do not have a record before us of a fully litigated crashworthiness case. However, for the guidance of both the state and federal trial courts, we *hold* today that in any crashworthiness case where there is a split of authority on any issue, as for example the plaintiff's burden of proof discussed

above, we adopt the rule that is most liberal to the plaintiff.[9]

Our conclusion today to adopt the rule most favorable to the plaintiff in crashworthiness cases is based upon the same actuarial considerations that have prompted us finally to adopt the doctrine of crashworthiness—namely, that we are *already* paying for full coverage. Indeed, in some world other than the one in which we live, where this Court were called upon to make national policy, we might very well take a meat ax to some current product liability rules. Therefore, we do not claim that our adoption of rules liberal to plaintiffs comports, necessarily, with some Platonic ideal of perfect justice. Rather, for a tiny state incapable of controlling the direction of the national law in terms of appropriate trade-offs among employment, research, development, and compensation for the injured users of products, the adoption of rules liberal to plaintiffs is simple self-defense.[10]

However, as we recently said in *Miller v. Monongahela Power Company*, 184 W.Va. 663, 403 S.E.2d 406 (1991):

If the federal courts wish to establish national uniformity on personal injury matters by rethinking the whole tort system and making clear, bright line rules of national application, no court would welcome such rules more hospitably than we. But until such federal rules are

---

8. *See, e.g., Mitchell v. Volkswagenwerk, A.G.*, 669 F.2d 1199 (8th Cir.1982), finding that "[the *Huddell* rule] leaves an injured victim as little more than a traffic statistic." *See also, Fouche v. Chrysler Motor Corp.*, 103 Idaho 249, 646 P.2d 1020 (App.1982), *aff'd*, 107 Idaho 701, 692 P.2d 345 (1984); *Lahocki v. Contee Sand and Gravel Co.*, 41 Md.App. 579, 398 A.2d 490 (1979), *rev'd on other grounds sub nom., General Motors Corp. v. Lahocki*, 286 Md. 714, 410 A.2d 1039 (1980); *Sumnicht v. Toyota Motor Sales, USA, Inc.*, 121 Wis.2d 338, 360 N.W.2d 2 (1984); *Chrysler Corp. v. Todorovich*, 580 P.2d 1123 (Wyo.1978).

9. For there to be a "split of authority," however, the rule urged by the plaintiff must have been

pronounced either by the highest court of a state or by a federal circuit court. Neither state intermediate courts of appeals cases nor federal district court cases are sufficiently authoritative to constitute a "split of authority" unless there are so many of them from one jurisdiction over such a long period that it can be reasonably inferred that the highest court of the state or the federal court of appeals acquiesces in the rule.

10. For mathematical models validating the futility of attempting responsible leadership in a federal structure lacking explicit and binding coordination, *see* M. Olson, *The Logic of Collective Action,* revised edition, Harvard University Press (Cambridge, Mass., 1971) and M. Olson, *The Rise and Decline of Nations,* Yale University Press (New Haven, 1982).

articulated by the Supreme Court of the United States, we shall not presume to anticipate that august body's ruling on the subject. [Footnote omitted].

*Miller*, 184 W.Va. at 671, 403 S.E.2d at 414.[11]

Accordingly, the certified question presented to us is answered and this case is dismissed from the docket of this Court.

Certified Question Answered.

---

**11.** In any adversarial system where residents are pitted against non-residents, there will inevitably be a temptation to redistribute wealth in the direction of residents, regardless of whether the "tribunal" deciding the issue is technically a court, legislature, or administrative agency. The greatest temptation in this regard, of course, is taxation. By far the best tax is one imposed on a stranger who can't vote or otherwise retaliate. Thus, left to their own devices, the dynamics of federalism would inevitably lead the states to tax interstate commerce at a higher rate than intrastate commerce. And, for exactly this reason, the Supreme Court of the United States has said that a state can't discriminate against interstate commerce by singling out imports or exports for special taxes, and that when taxing the income or personal property of an interstate business, states must apply apportionment formulae that would yield fair taxes if applied by every other state. *See Complete Auto v. Brady*, 430 U.S. 274, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977); *Armco Steel v. Hardesty*, 467 U.S. 638, 104 S.Ct. 2620, 81 L.Ed.2d 540 (1984).