charge the administrator with the same item, and the exception taken by the administrator to such finding of the referee was well taken. The report of the referee should be modified in that respect, and the administrator should not be charged with such amount. Second. The administrator excepts to' the refusal of the referee to allow him the credit of $2,558.16, alleged by the administrator to have been loss on the lease of the premises in question from the date of the death of the decedent up to the time of the sale of the business, and to finding 53, which relates to this point. The referee having already found that the administrator was negligent in not sooner disposing of the business and leasehold belonging to the estate of decedent, and this loss being incident to such negligence, the finding of the referee is correct, and the exception is overruled. It is also contended that the referee erred in charging the administrator with $4,000, the value of the good will of the business and the leasehold, over and above the items set forth in the inventory. It is claimed by the administrator that the sale of the fixtures, etc., for $10,000, included the good will of the business and the value of the leasehold. This claim is not supported by the evidence, for in both the original and the amended accounts a detailed statement appears of the articles which were sold tor $10,000, and it is clear that the good will was not one of such items, nor was the leasehold. Sufficient evidence was introduced as to the value of the good will and the leasehold to justify the finding of the referee. The report, as thus modified, is confirmed.

---

(5 Misc. Rep. 274.)

## In re PORTER'S ESTATE.

(Surrogate's Court, New York County. October, 1893.)

EXECUTORS AND ADMINISTRATORS—ACCOUNTING—RETAINING INVESTMENTS.

An administrator received, among the assets of the estate, shares of stock of a speculative character, and he took the risk of retaining them; thereby making for the estate a large sum in dividends, and eventually disposing of a portion for more than the inventoried value of the whole. It appeared that he acted in good faith, and with great judgment. *Held*, that the administrator would not be charged with losses on some of the stocks because of a technical violation of his duty, in not disposing of them.

Accounting by the administrators of decedent's estate. The matter was ordered to be heard by a referee, and now comes up on exceptions to the referee's report.

Arnoux, Ritch & Woodford, for administrators.
Porte V. Ransom, special guardian.

RANSOM, S. Among the assets which came into the possession of the administrators herein, were shares of stock in various corporations, of a speculative character. Instead of disposing of these, they took the risk of retaining them. One block of 50 shares in an ice company, which was appraised at $5,000, brought into the estate nearly $11,000 of dividends, and was afterwards sold for

$8,300. Another lot, appraised at $1,000, earned in dividends nearly $80,000, and the stock is still retained by the estate. Some other of the stock paid dividends for a time, and then ceased. Others never brought in any income whatever. Taking the estate as a whole, the administrators have disposed of and collected a little more than the entire inventoried value, while they have received for interest on balances and dividends nearly $150,000. Among the securities so held by the administrators, were 100 shares of the stock of a mining company, the par value of which was $10,000, and which was appraised at $5,000. This stock has never been sold. Dividends to the amount of $1,500 have been received. The evidence shows, and the referee finds, that the stock has always been unsalable. The accountant, however, claims credit for a subscription of $5,000 of the bonds of the company, which he purchased for the purpose of protecting the stockholding of the estate. An objection was made to the allowance of this sum by the special guardian, and was sustained by the referee, who charges the administrators therefor, and with interest thereon from the time of payment.

The court deals with executors and administrators with much greater liberality, where investments which result disastrously come into their hands from the deceased. They are only required to act in good faith, and to exercise a sound discretion. "Although, by the light of subsequent events, the course determined on may appear unwise, he cannot be held liable for any loss or depreciation of stock, unless it be found that he acted carelessly, or in bad faith. If the testator has given no directions in his will, the ordinary rules of prudence and diligence apply, and the fact that he has invested his property in particular stocks, shares, or corporations, mortgages or securities, will go far in justifying his executor in continuing them." 2 Woerner, Adm'n, p. 710, and cases cited. In the case at bar, no question whatever is made as to the good faith of the accountant. In pursuing a settled and consistent policy with reference to the speculative securities of different kinds which came into his possession, he acted with rare good judgment. Had he looked only to his own protection from risk, and a speedy settlement of the estate, and consequent shifting of responsibility from his shoulders, the infants in whose behalf complaint is now being made would have been deprived of the enormous advantages which have accrued from his management. To permit a distributee to select an investment out of others more fortunate, though the executor's conduct with reference to all has been actuated from the same motives, and in the exercise of the same discretion, would be a gross injustice. It is a familiar maxim "that he who seeks equity must do equity," and infants are not more relieved from this rule than adults. Upon a survey of the entire administration of this accountant, I think that his judgment is to be commended; that his good faith is beyond question; and still it is seriously urged that I must, nevertheless, mulct him in a large sum of money because of a technical violation of law, although the persons seeking thus to penalize him have been, by just such violation, largely benefited. Such a claim does not recommend itself to my notions of equity, and I refuse to

give the support of my opinion to such construction of the law. In the respects above alluded to, the exception to the referee's report is sustained, and in all other respects the report is confirmed.

---

(4 Misc. Rep. 512.)

## In re BURTON'S WILL.

(Surrogate's Court, Otsego County. July, 1893.)

WILLS—REVOCATION—MARRIAGE.

    After a married woman had made a will the marriage was dissolved, and she married again. *Held*, that 2 Rev. St. p. 64, § 44, providing that "a will executed by an unmarried woman shall be deemed revoked by her subsequent marriage," did not apply to such case, and the will was not revoked by the second marriage.

Proceeding for the probate of the will of Anna E. Burton, deceased. Granted.

Charles T. Brewer, for proponent.
L. J. Arnold, special guardian of Julia K. Miller.
W. H. Bunn, for Whitney J. Burton, contestant.

TENNANT, S. Anna E. Burton died on the 18th day of May, 1893, the owner of personal property amounting to about $2,600, leaving a husband, the contestant, and one child by a former marriage, Julia K. Miller, who is an infant 19 years of age. She left an instrument in writing, bearing date the 3d day of July, 1891, now offered for probate as her will, by which substantially all of her property is bequeathed to her daughter, Julia K. Miller. The deceased was married to one William P. Miller on the 9th day of September, 1868, and remained his lawful wife until the 20th day of May, 1892, when the marriage was dissolved by a judgment of the supreme court of the state of New York in her favor. Afterwards, on the 30th day of May, 1892, the deceased was married to the contestant, Whitney J. Burton. The only issue born of either marriage is the said Julia K. Miller. The instrument in question was executed by the deceased when she was a married woman, the wife of William P. Miller, her first husband. Indisputably the paper propounded was executed in the manner and with all the formalities prescribed by the statute, and the deceased was then of sound mind, in every respect competent to execute the same, and was not under any restraint or undue influence. The contestant insists that the will was revoked by the subsequent marriage of the deceased to him, and his contention is founded solely upon the statute, which provides as follows: "A will executed by an unmarried woman shall be deemed revoked by her subsequent marriage." 2 Rev. St. art. 3, c. 6, p. 64, § 44. Counsel for contestant, conceding that when this will was executed the testatrix was a married woman, contends that because she ceased to be a married woman on the 20th day of May, 1892, by force of the judgment of the court, and during the 10 days that intervened between the rendition of such judgment and her marriage to the contestant, she was an "unmarried woman," and