459 S.E.2d 906

**STATE of West Virginia, Plaintiff
Below, Appellee,**

v.

**MORGAN STANLEY & CO., INCORPO-
RATED; Salomon Brothers, Inc.; and
Goldman, Sachs & Co., Defendants Be-
low,**

**Morgan Stanley & Co., Incorporated,
Defendant Below, Appellant.**

No. 22358.

Supreme Court of Appeals of
West Virginia.

Submitted May 10, 1995.

Decided June 5, 1995.

Mary Wolff, Wolff Ardis, Memphis, TN,
Rudolph L. DiTrapano, DiTrapano & Jack-

son, Charleston, Silas B. Taylor, Asst. Atty. Gen., Charleston, for appellee.

Robert B. King, George G. Guthrie, King, Allen & Arnold, Charleston, Stephen G. Jory, Jory & Smith, Elkins, James W.B. Benkard, Davis Polk & Wardwell, New York City, for appellant.

NEELY, Senior Justice:

*La vittoria trova cento padri, e nessuno vuole riconoscere l'insuccesso.*[1]

The issues before us today are whether a summary judgment for roughly $52 million entered against Morgan Stanley & Co., the New York securities dealer, in favor of the State of West Virginia was proper, and whether a jury properly returned a $4.9 million verdict against Morgan Stanley for constructive fraud. We find neither proper and reverse.

### *An Overview*

In 1978, at the behest of then State Treasurer Larrie Bailey, the West Virginia Legislature created the West Virginia Consolidated Fund, which is a state investment pool comprised of idle monies, usually operating funds, of the State and its agencies (both of which were required by law to participate in the Consolidated Fund) and of various local governments (which participated in the Consolidated Fund on an elective basis).[2] When the Fund was first conceived by Treasurer Bailey, it was a device to earn high interest by putting idle money to work. The Fund was managed by the West Virginia Board of Investments (Board), which was composed of the Governor, the State Auditor and the State Treasurer.

The Board delegated the actual management of the Fund to the Investment Division of the West Virginia State Treasurer's of-

fice.[3] The Treasurer's office collected from some fund participants a fee, in the form of a charge against interest earnings, to recover its costs in operating the Fund.[4] When the events at issue in this case occurred, the Fund managed approximately $2.5 billion in assets.

In 1984, Treasurer Bailey, an investment professional who had worked in national brokerage firms and was licensed by the Securities and Exchange Commission, was defeated for renomination. Treasurer Bailey's place was taken by A. James Manchin, who had previously been Secretary of State and who had held other responsible government jobs where he had acquitted himself with distinction. Nonetheless, Treasurer Manchin was not an experienced financial executive. At the same election, Governor John D. Rockefeller, IV moved on to the United States Senate and Arch A. Moore, Jr. returned to the governorship after an eight-year hiatus to begin his unprecedented third term. That left only State Auditor Glen B. Gainer, Jr. as a hold-over member of the Board of Investments in January, 1985.

The Consolidated Fund (under the policy direction of the Board of Investments) first began *trading* government securities (as opposed simply to buying and *holding* government securities) in 1983 when Governor Rockefeller was Chairman. During this early period, however, the State traded small blocks of $5 million to $10 million. Anticipating that an inexperienced Board and an inexperienced treasurer's staff might not understand the role of *limited* trading in short-term securities in managing a large portfolio, the old Board of Investments (composed of Governor Rockefeller, Treasurer Bailey and Auditor Gainer), as one of its last official acts, passed investment guidelines that, among other things, prohibited the Investment Division from purchasing any security with a maturity in excess of 90 days without ·specific Board approval.

---

1.  "Victory has a hundred fathers, but defeat is an orphan." Count Galeazzo Ciano, *Diary* (1946) vol. 2, 9 September 1942.

2.  *See W.Va.Code* 12–6–8 [1978].

3.  *See W.Va.Code* 12–6–4 [1978] and 12–6–12 [1978].

4.  *W.Va.Code* 12–6–6 [1983].

Upon assuming the Treasurer's office early in 1985, Mr. Manchin immediately appointed Arnold Margolin as Associate Treasurer in charge of investments. Mr. Margolin had gained widespread recognition earlier in his career in West Virginia for his financial expertise and had served with distinction as Commissioner of Finance and Administration in the latter part of the Rockefeller administration. Treasurer Manchin retained Kathryn M. Lester as Director of Investments, a position she had held in Treasurer Bailey's office.

At the first meeting of the new Board of Investments in February, 1985, Treasurer Manchin introduced a resolution to overturn the restrictive guidelines put in place by the previous Board. This resolution was passed over Auditor Gainer's negative vote. Among other things, the new guidelines, as proposed by Mr. Manchin and passed by the Board, authorized the investment staff to buy and sell securities with maturities of up to ten years without prior Board approval. The new guidelines, by changing portfolio composition requirements, also enabled the staff to use a larger percentage of the Fund to trade longer term securities.[5] Although in hindsight these changes were disastrous, at the time (and among the young and inexperienced) these changes were thought to enable the staff to take advantage of profit opportunities offered by trading interest-rate-sensitive securities.

Thus in 1985, the Investment Division, on behalf of the Consolidated Fund, launched a program of actively trading U.S. Government securities. The Investment Division did not act through an agent (such as a broker) or employ an outside investment advisor; rather, the State entered the bond market as a direct participant, simultaneously trading one-on-one with numerous primary dealers, including Morgan Stanley. Importantly for the case before us, the State's active trading strategy met with sustained, highly publicized success that garnered lavish accolades from both the West Virginia press and our citizenry.

Nonetheless, in the spring of 1987, the government bond market took an unexpected and precipitous nosedive and our Consolidated Fund, like many other market participants, sustained enormous losses.[6] The losses in our Consolidated Fund, amounting to hundreds of millions of dollars, caused extensive public outrage. Treasurer Manchin was forced to resign under threat of impeachment, and Associate Treasurer Margolin (apparently the designated scapegoat) was sentenced to federal prison for reasons related to his conduct during the investigation of the losses (but *not* for anything that had to do with the losses themselves!)

Before the losses occurred, in the period when the Fund's strategy was successful, there had been a steady stream of newspaper articles in the Charleston press with headlines such as, "Constant Buying, Selling Pays Off for Investment Pool" and "Flexibility Called Key to Fund's Success." There were reports, for example, that "[t]he State Investment Pool is able to pay almost 'unbelievable' interest rates ... because staffers are able to buy and sell securities at a minute's notice." In addition, in response to inquiries from potential Fund investors, the Treasurer's staff made it a practice to explain in detail how they *traded* large blocks of securities on a daily basis, profiting from volatility in the market. Nonetheless, when the losses occurred, the same press (and public) that had been so eager during good times to extoll the Investment Division staff's acumen and expertise, turned savagely on that same staff like dogs on a wounded animal.

---

5. By "longer term securities" I mean notes and bonds with maturities between two and thirty years. Short term securities are less sensitive to interest rate changes than longer term securities because an investor can simply wait until maturity when the security will pay its face principal amount.

6. On 27 March 1987, President Ronald Reagan announced possible trade sanctions against Japan. With the release of this news, the entire bond market—including the seven-year, when-issued Treasury notes that are an important part of this case—began to fall.

In the wake of the shock that $280 million in trading losses evoked, the State sued Morgan Stanley and several other securities dealers to recoup part of the loss. Six other Wall Street firms which did business with the State, including Salomon Brothers and Goldman Sachs, have paid $28 million to settle claims arising from their involvement in the debacle.[7]

There are thousands of pages of transcript and documents in this case. Our review of this voluminous and well-developed record leads us to conclude that everyone involved in this fiasco on the State's side was working hard in what they, in good faith, thought to be the best interests of the people of the State of West Virginia.[8] Other than the personal satisfaction and opportunities for promotion that inure to good workers generally, none of the people involved in the losses at issue in this case on the State's side profited or attempted to profit *personally* from the trading undertaken by the Consolidated Investment Fund. Morgan Stanley was not at any time a fiduciary of the State

of West Virginia; Morgan Stanley was a co-principal, which bought and sold notes and bonds from and to the State of West Virginia, bought and sold put and call options from and to the State of West Virginia, and lent money to the State of West Virginia (secured by bonds owned by the State) to allow the State to pursue its aggressive trading strategy. Morgan Stanley *did* provide investment information to the State and it *aggressively* pursued the State as a customer.

### The Facts of This Case

In a protracted trial in the Circuit Court of Kanawha County, judgment was entered against Morgan Stanley and in favor of the State for $56,824,183.63, including interest and costs. Roughly ninety percent of that judgment, however, resulted from a summary judgment ruling on the eve of jury deliberations by the circuit court that Morgan Stanley had knowingly aided and abetted the staff of the Investment Division in violating their fiduciary duty to the Consolidated

---

7. For an excellent summary of what happened, *see* Leslie Wayne, "Big Risks, Big Losses, Big Fight," *The New York Times*, 23 April 1995, Section 3, page 1.

8. Anyone who believes that Treasurer Manchin, Mr. Margolin, and Ms. Lester were particularly gullible or unusually enthralled with their own good luck, should read today's press to put what our West Virginia portfolio managers did in perspective. The urge to get rich quick is irrepressible! For example, the front page of the third section of *The Wall Street Journal* on 22 May 1995 had a story by Suzanne McGee under the headline, "A Big Investor Feels Little Fear of Derivatives" that went as follows:

   NEW YORK—For many institutional investors, derivatives are too hot to handle these days. But don't tell that to Richard Rose, the chief investment officer of the San Diego Employees' Retirement System.

   Mr. Rose is a true believer, at least when it comes to one of the most traditional derivative-investment strategies: putting money into managed futures. Run by managers known as "commodity-trading advisers," these funds use publicly-traded futures and options to bet on price trends in currencies, commodities, stocks and bonds.

   Just last week, Mr. Rose, persuaded his fund's board members to more than double the

fund's current allocation to managed futures, to 5% of its assets, boosting its total investment in these products to about $110 million from $45 million. In addition, he won approval to use futures in an "overlay" strategy: putting up only the margin, or collateral, required to take positions in futures and options markets. That means that instead of having to keep $110 million in a separate account, the fund will be able to deploy those funds elsewhere. The $16 million or so required for margin payments for the managed-futures positions will come from its operating budget.

   "This is really kind of revolutionary for the industry; we seem to be the first institution to take this next, very logical step," Mr. Rose says, referring to the overlay strategy. But, he adds, "There are, historically, good rates-of-return associated with accepting a higher degree of volatility."

   Not only is this doofus trading in futures derivatives for a *pension* fund, but he's leveraging on margin! What's worse, *The Wall Street Journal* itself, in the person of Ms. McGee, seems to be confusing profits in a bull market with intelligence yet again! I wonder if Mr. Rose believes that he is the first person to have figured out that there are "good rates-of-return associated with accepting a higher degree of volatility?" Treasurer Manchin, Mr. Margolin and Ms. Lester simply found themselves on the receiving end of the "volatility" parameter.

Investment Fund by "speculating" in violation of *W.Va.Code* 12–6–12 [1978].[9]  *Code* 12–6–12 [1978] provides:

> Any investment made under this article shall be made with the exercise of that degree of judgment and care, under circumstances then prevailing, which men of experience, prudence, discretion and intelligence exercise in the management of their own affairs, *not for speculation but for investment,* considering the probable safety of their capital as well as the probable income to be derived.  [Emphasis added.]

There is a narrow period that concerns us here, namely the period from 10 March 1987 when the State sold a "put"[10] for $200 million in seven-year Treasury notes[11] until 21 April 1987 when John Mack, the head of Morgan Stanley's fixed income division, developed serious anxiety about whether the State had abandoned its trading discipline[12], and having not received adequate reassurance from the State, ended Morgan's relationship with the State.

There were two transactions with Morgan Stanley that involved big losses for the State: (1) the 10 March 1987 sale of the $200 million "put" on seven-year Treasury notes;  and (2) the purchase, beginning on 18 March 1987, of roughly $1.2 billion in "when-issued" seven-year Treasury notes.[13]  One-third of this latter portfolio of when-issued Treasury notes was liquidated, but ultimately $550 million worth of these notes were financed by a reverse repurchase agreement and, as the market price of these securities declined, large losses were taken.[14]

The loss on the March, 1987 put option was calculated by the State and accepted by the trial court as the difference between the price the State paid Morgan for the ten-year Treasury notes upon Morgan's exercise of its option and the price at which the State sold those notes (to a third party) on the same day.  That difference was $7,620,313.  But when the State sold the put option to Morgan Stanley, the State received a premium of $843,750 from Morgan.  If the State had invested that premium, it could have earned interest of $7,992.  In determining the total

9.  The parties and the trial court refer to the court's ruling as a "summary judgment," but it is closer to a Rule 50, *WVRCP* directed verdict than it is to a traditional Rule 56, *WVRCP* summary judgment because the Court's decision was made after all the evidence was presented at trial.  The confusion arises, perhaps, because today under Rule 50, *WVRCP*, it is no longer necessary to go through the formal process of submitting the case to the jury so that the jury will enter the verdict as directed.  Rule 50(a), *WVRCP*.

10.  A "put" is an undertaking to buy a bond or other financial instrument, such as a stock, at a future time for a certain price.  Thus, if I sell a "put" undertaking to buy seven-year, five percent Treasury notes with a face amount of $10 million for $10 million, and long-term interest rates *increase* during the 90 days from the time I sell the put until it expires, I must still buy the bonds for $10 million notwithstanding that their market value may have declined by as much as $500,000 because their interest rate yield remains five percent for seven years while new bonds in the market will be paying, say, six percent.

11.  Technically, Treasury notes have maturities of one to ten years, while Treasury bonds have maturities of longer than ten years, but both are commonly referred to as "bonds."

12.  Mr. Margolin and Ms. Lester assured Morgan Stanley that the State employed a rigorous trading discipline:  the State sold as soon as it began to take a loss and it sold as soon as there was a reasonable profit.  To the extent such a discipline was followed, loss exposure was reduced.

13.  "When-issued" Treasury notes are notes that the Treasury has announced will be issued, but whose coupon rate has not yet been declared.  Market participants may buy the right to purchase these instruments before they are issued and there is active trading;  the problem is that the *right* to purchase also entails the *obligation* to purchase.

14.  A "reverse repurchase agreement" is a device used when a trader in securities has undertaken to buy securities with the expectation that he will sell his right to buy the securities at a profit before he must actually pay.  However, if a person cannot sell his right to purchase the securities (with its reciprocal *obligation* to buy the securities at a particular price) at a profit, but only at a loss, a dealer will lend the trader enough money to pay for the securities, taking the securities themselves as collateral, and the trader may then hold the securities in the hopes that the market will rise.

amount of damages suffered by the State as a result of the March, 1987 put option, the State credited Morgan with $851,742, representing the premium the State received plus the interest it could have earned on that premium against the $7,620,313 loss on the sale of the securities. Thus, the State suffered a loss on the March, 1987 put option of $6,768,571.

The State and the trial court calculated the State's damages on the March, 1987 trading in the when-issued, seven-year Treasury notes by determining the difference between the purchase and sale price of the when-issued notes. The State lost money on all but two of those trades; of the two trades on which it did not lose, it realized a gain on one and it broke even on the other. The gain or loss on all transactions with Morgan involving the when-issued, seven-year Treasury notes was included in determining the State's net losses, and that amount was undisputed at $22,723,511.[15]

### The Jury Verdict Issue

The case was submitted to the jury on the State's claims of fraud, constructive fraud and punitive damages. These claims were asserted with respect to the same transactions about which the circuit court had entered summary judgment, plus an additional claim related to volume trading. However, the jury was *not* advised of the amount of money (over $32 million) the court had awarded the State as a result of the summary judgment (*qua* directed verdict) on the *W.Va.Code* 12–6–12 [1978] speculation claim, although the jury *was* advised of the court's conclusion that Morgan Stanley had violated *Code*, 12–6–12 [1978] because the transactions at issue were "speculation."[16] Five weeks of live and video testimony was presented to the jury and, at the end of the trial, the State's lawyers exhorted the jury to punish the "Wall Street ... hounds of greed" by awarding the State not only restitutionary damages of $40 million, but punitive damages as well.

After deliberating only four hours, the jury returned its verdict finding no actual fraud, awarding no punitive damages, and awarding $4.9 million, or only slightly more than one-tenth of the amount demanded, on the constructive fraud claim. Morgan Stanley asserts here that the circuit court erred in

---

15. On 6 May 1992, the circuit court directed a verdict on the *W.Va.Code* 12–6–12 [1978] speculation claim in a principal amount of approximately $32 million, later increased, with the addition of interest, to roughly $52 million.

16. In this regard, the court's instruction to the jury as part of a connected charge was as follows:

"The monies at issue in this lawsuit were part of the State's Consolidated Fund and as such were required by law to be invested in accordance with the provisions of the West Virginia Investment Management Law. Among other things, the Investment Management Law provided that investments made on behalf of the State 'shall be made with the exercise of that degree of judgment and care, under circumstances then prevailing, which men of experience, prudence, discretion and intelligence exercise in the management of their own affairs, not for speculation but for investment, considering the probable safety of capital as well as the probable income to be derived from the investment.'

The interpretation of a statute is a question of law for the Court, and I have concluded that the word 'speculation' as used in the Invest-

ment Management Law refers to a financial transaction in which there is a real and identifiable risk of loss depending ordinarily on market fluctuations. Speculation also refers to a strategy that is inherently unsafe because its outcome is not susceptible to prediction with any reasonable degree of certainty.

I have concluded that Morgan Stanley is liable to the State as a matter of law for the damages sustained by the State as a result of the when-issued transactions, the reverse repurchase transactions and the put option transaction because those transactions with Morgan Stanley violated West Virginia law since they were for speculation, not for investment. The fact that I have found those certain transactions to be speculative is not evidence of fraud. The State must establish, separate and apart from that legal ruling, each and every one of the elements of its fraud claims by clear and convincing evidence."

Trial Court charge, pp 13, 14.

This instruction, telling the jury that Morgan Stanley had behaved *illegally* by violating the investment statute, is important later when we consider the vague instructions on "constructive fraud."

allowing the constructive fraud claim to go to the jury because the court had previously granted Morgan Stanley's motion for summary judgment on the State's claim for breach of fiduciary duty, holding that no fiduciary relationship existed between the State and Morgan Stanley.

We agree with Morgan Stanley that the jury verdict must be reversed, but for reasons different from those that Morgan Stanley advances: Having decided as a matter of law that Morgan Stanley participated in "speculation", (*see*, *supra*, note 15) the court's instruction on constructive fraud *compelled* a jury finding against Morgan Stanley. Because we conclude that the issue of *whether* Morgan Stanley violated *Code* 12–6–12 [1978] is a jury question, the jury's finding of constructive fraud was based on a finding of illegality on which the trial court should *not* have given a binding instruction.

The Court's charge on constructive fraud was as follows:

> Constructive fraud is a breach of a legal or equitable duty, which, irrespective of any moral guilt on the part of the defendant, the law declares fraudulent because of its tendency to deceive others, or violate public or private confidence, or to injure public interests. Neither actual dishonesty of purpose nor intent to deceive is an essential element of constructive fraud. Constructive fraud includes violations of public policy or public rights or transactions affected by illegal conduct of any kind. Constructive fraud may involve a mere mistake of fact, but it exists in cases in which the defendant's conduct, although not actually fraudulent, has the consequences and effects of actual fraud. In such a case the law assumes fraud in order to protect valuable social interests.

To establish its claim of constructive fraud, the State must prove the following elements:

> 1. *That Morgan Stanley breached a legal or equitable duty owed to the State;* and
>
> 2. That Morgan Stanley's breach of its duty had either:
>
> a. A tendency to deceive the State;
>
> b. A tendency to violate public or private confidence; or
>
> c. *A tendency to injure public interests.*

[Emphasis added.]

Trial Court Charge, pp. 21–22.

▆▆▆ This instruction, combined with the Court's instruction informing the jury that Morgan Stanley had violated West Virginia law by aiding and abetting "speculation," was tantamount to directing a verdict against Morgan Stanley on the constructive fraud claim. When a jury verdict is premised upon an erroneous conclusion of law by a trial court as stated in the charge to the jury, it must be set aside.

Notwithstanding that Morgan Stanley sedulously cultivated good customer relations with the State of West Virginia, Morgan Stanley was nonetheless a principal in the transactions at stake, not a broker, and Morgan had the right to trade with the State without undertaking the obligation to *insure* the State against its elected officers' lack of wisdom.[17] "Sophistication", as that term is used in the investment law, should never be confused with intelligence, prudence or good luck. (*See*, *supra*, note 8.) *Securities and Exchange Commission v. Ralston Purina*

---

**17.** It is hard to find fraud—constructive or otherwise—when officials at the State Treasury were: (a) sophisticated investors; and (b) audited by other State officials, including the State Legislative Auditor. The Board of Investments approved the actions that are at issue in this case and, to the extent that any Board of Investment guidelines were violated, such guidelines were simply internal rules; to say that Morgan Stanley could not reasonably have relied on Mr. Margolin's and Ms. Lester's undisputed and *very earnest* representations that deviation was permitted by the Board is tantamount to confessing that West Virginia officials must at all times be treated as either children or incompetents. We are unwilling to accede to this proposition. Again, *see*, *supra*, note 8, which strongly suggests that competent adults who do not need to be led around on a leash do, occasionally, buy a piece or two of blue sky.

*Co.*, 346 U.S. 119, 73 S.Ct. 981, 97 L.Ed. 1494 (1953); *Xaphes v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 632 F.Supp. 471, 481–483 (D.Me.1986); 17 *C.F.R.* § 230.215; 17 *C.F.R.* § 230.501(a); C. Edward Fletcher, III, "Sophisticated Investors Under the Federal Securities Laws," 1988 *Duke L.J.* 1081.

### The Summary Judgment Issue

The State's argument in support of the lower court's summary judgment ruling is concise, logical and based on overwhelming existing law so far as such law goes. In short, the argument is as follows: (1) the Treasurer's staff was prohibited by *W.Va. Code* 12–6–12 [1978] from speculating; (2) overwhelming evidence in the form of taped conversations [18] between Kathy Lester and members of Morgan Stanley's executive staff, as well as Morgan Stanley's own internal documents, conclusively shows that Morgan Stanley *knew* that the State was speculating; and (3) black letter trust law holds that a person who knowingly aids and abets a fiduciary to violate his fiduciary duty is himself liable for any loss that proceeds from that violation of fiduciary duty. *Wooddell v. Bruffy's Heirs*, 25 W.Va. 465 (1885). ("A party who concerts, or unites with a fiduciary in any act contrary to the duty of such fiduciary, becomes *pa[r]ticeps criminis* and will be held liable accordingly." Syllabus Point 2, *Wooddell* ) *Restatement (Second) of Trusts*, § 326.[19]

The logic of the trial court's ruling is nearly ineluctable, yet we are still deeply troubled. Much to the consternation of law students, practicing lawyers and even new judges, law is not physics with precise rules and mathematical formulae. Law, like medicine, is an art as well as a science. That is why we are called "judges" and why Microsoft, even as we write, is not attempting to supplant us with a new judicial computer program. There is, therefore, always an element of human judgment that enters any complicated case, which is why the process traditionally calls upon the organized collective intelligence of a trial court judge, trial jury, and at least one appellate court.

The summary judgment ruling of the trial court certainly comports with the theory of Rule 50, *WVRCP*, but, nonetheless, this Court has great anxiety about the overall equity of this case. Accordingly, we must pause here for a moment in the analysis of investment and trust law to put what, at the end of the day, is Morgan Stanley's most compelling argument into historical perspective. Essentially, Morgan Stanley argues that they were blameless and that they have a right to have the case submitted to a jury that will weigh the equities as well as what seems to be the law. We agree that Morgan Stanley has a right to have the case tried to a jury.

### Juries and Equity

In 1687, King James, II came to despair of achieving his dream of restoring the Roman Catholic faith to England because an act of Parliament banned from public office anyone except a practicing communicant of the Church of England, thus barring Roman Catholics and dissenting Protestants from royal preferment. Without the ability to place Roman Catholics in high office and then to bestow Crown benefits upon them, James could not assure a Catholic successor because, given James' age, a successful Cath-

---

**18.** All conversations between the Treasurer's office and the dealers in New York were routinely recorded so that there would be a verbatim record of trades made.

**19.** *But see also, W.Va.Code* 31–4D–7(a) [1961] which provides:

No person who participates in the acquisition, disposition, assignment or transfer of a security by or to a fiduciary including a person who guarantees the signature of the fiduciary is liable for participation in any breach of fiduciary duty by reason of failure to inquire whether the transaction involves such a breach unless it is shown that he acted with actual knowledge that the proceeds of the transaction were being or were to be used wrongfully for the individual benefit of the fiduciary or that the transaction was otherwise in breach of duty.

olic Regency would need to be put in place for any possible male heir.[20] James, therefore, without the consent of Parliament, issued an Edict of Indulgence lifting for both Roman Catholics and dissenting Protestants the ban on holding office imposed by statute.

In the spring of 1688, James resolved that he would require all priests throughout his realm (with a view to giving the Edict of Indulgence greater legitimacy) to read the Edict of Indulgence from the pulpit and, in furtherance of that design, he ordered all bishops to require such reading by their inferior clergy. The hierarchy of the Church of England, the Lords Temporal, and the overwhelming majority of citizens—even dissenting Protestants—were outraged! And so, in May of 1688, seven prominent bishops in the South of England—the Archbishop, Lloyd of St. Asaph, Turner of Ely, Lake of Chinchester, Ken of Bath and Wells, White of Peterborough, and Trelawney of Bristol—gathered and agreed that they would not comply with the King's order and, in explanation, prepared and personally delivered to the King a petition setting forth their grievance that the King was acting *ultra vires*. Parliament had, indeed, both in the late reign of Charles II and in the present reign, pronounced that the sovereign was not constitutionally competent to dispense with statutes in matters ecclesiastical. The Edict of Indulgence was, therefore, illegal.

The King became incensed, and ultimately caused a criminal information to be brought against the bishops for seditious libel. To the consternation of the populous, the bishops were imprisoned in the Tower of London pending trial and, in due course, were brought before a petit jury presided over by sycophants of the Crown. During that trial, the Crown presented overwhelming evidence that the bishops published a seditious libel (as the law then defined "seditious libel") in the County of Middlesex on the day charged. Although the Crown was essentially entitled to a directed verdict, the jury nonetheless acquitted. The whole prosecution was preposterous! Thus, we have what is perhaps the leading (but not the earliest) instance in Anglo–American law of "jury nullification"— a valuable prerogative that intrudes itself into the rational court mechanism when, notwithstanding technical legal rules, the application of those rules to the facts at hand would be an utter outrage and such that all mankind should exclaim against it at first blush.[21]

In our modern law the standard for granting summary judgment has been well set for quite a while. We recently summarized the law in syllabus points 1 through 4 of *Painter v. Peavy*, 192 W.Va. 189, 451 S.E.2d 755 (1994):

1. A circuit court's entry of summary judgment is reviewed *de novo*.

2. " 'A motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law.' Syllabus Point 3, *Aetna Casualty & Surety Co. v. Federal Insurance Co. of New York*, 148 W.Va. 160, 133 S.E.2d 770 (1963)." Syllabus Point 1, *Andrick v. Town of Buckhannon*, 187 W.Va. 706, 421 S.E.2d 247 (1992).

3. The circuit court's function at the summary judgment stage is not to weigh the evidence and determine the truth of the matter, but is to determine whether there is a genuine issue for trial.

4. Summary judgment is appropriate where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, such as where the nonmoving party has failed to make a sufficient showing on an essential element of the case that it has the burden to prove.

The State, then, argues that any investment whose profit potential (and exposure to loss)

---

20. *See*, Thomas Babington Macaulay, *History of England*, Everyman Edition, J.M. Dent & Sons Ltd. (London, 1964) Vol. II, pp. 114–174.

21. For an excellent summary of the early history of nullification, *see*, Philip B Scott, "Jury Nullification: An Historical Perspective on a Modern Debate", 91 *W.Va.L.Rev.* 389.

derives from attempts accurately to predict future market fluctuations is necessarily speculative because no one can consistently and accurately predict the market.

██ We believe the issue of whether the trial court was correct in entering summary judgment is very close, but subjecting Morgan Stanley to a roughly $52 million judgment without benefit of jury review seems inappropriate for reasons that are perhaps at odds with a mechanistic approach to law but, nonetheless, comport with overall equity. As Dean Pound once said: "Jury lawlessness is the great corrective of law in its actual administration." [22] And, although jury nullification is out of favor as an explicit jury function in modern times, it is still worth savoring Mr. Justice Jay's charge to the jury in the *civil* case of *Georgia v. Brailsford*, 3 U.S. 1, 3 Dall. 1, 4, 1 L.Ed. 483, 484 (1794):

> It may not be amiss, here, Gentlemen, to remind you of the good old rule, that on questions of fact, it is the province of the jury, on questions of law, it is the province of the court to decide. *But it must be observed that by the same law, which recognizes this reasonable distribution of jurisdiction, you have nevertheless a right to take upon yourselves to judge of both, and to determine the law as well as the fact in controversy.* On this, and on every other occasion, however, we have no doubt, you will pay that respect, which is due to the opinion of the court: For, as on the one hand, it is presumed, that juries are the best judges of facts; it is, on the other hand, presumable, that the court are the best judges of law. But still both objects are lawfully, within your power of decision. [Emphasis added.]

Mr. Justice Jay's jury instruction would not be given today in federal court, yet even in federal court there remains an abiding respect for the *power* of the jury to nullify oppressive law, even if there is no express *right* on the part of the jury to do so. *See,* e.g., *Sparf v. United States,* 156 U.S. 51, 15 S.Ct. 273, 39 L.Ed. 343 (1895); *United States v. Dougherty,* 473 F.2d 1113 (1972); *United States v. Moylan,* 417 F.2d 1002 (1969); *United States v. Spock,* 416 F.2d 165 (1969).

Although we recognize that Rule 50, *WVRCP* would seem to be at odds with a defendant's right to have a jury pass on the total justice of a *civil* cause unless there are disputed questions of fact, in a case such as the one before us where the judgment is not for unjust enrichment or gains made by Morgan Stanley, but is more in the nature of a fine or an effort to shift the loss among equally guilty parties, the defendants certainly meet the standard of Syl. pt. 2 of *Painter v. Peavy, supra,* that inquiry into the facts will clarify the application of the law. [23]

### *Law Applicable on Remand*

In hindsight, of course, the proposition that no one can predict the market is eminently unexceptionable, and had the Consolidated Investment Fund been managed by members of America's old-monied élite, where children are taught from the cradle the two cardinal rules for preserving fortunes—(1) never spend principal; and, (2) never attempt to predict the market—none of these losses would have occurred. But the people who were managing the Consolidated Investment Fund had neither the benefit of

---

22. Roscoe Pound, "Law in Books and Law in Action," 44 Am.L.Rev. 12, 18 (1910). *See also, Sparf and Hansen v. United States,* 156 U.S. 51, 110, 15 S.Ct. 273, 296, 39 L.Ed. 343 (1895) (Gray and Shiras, JJ., dissenting).

23. It is a mistake to think that in counter-principal trading one side's losses are the other sides' gains. Suppose the State buys a security for $10 from Dealer X and then sells it to Dealer Y for $8; the State thus has a "loss" of $2, which under the plaintiff's theory in this case is assessable against either Dealer X or Dealer Y. But by

no means does either Dealer X or Dealer Y necessarily have a gain of $2 from its transaction with the State. Dealer X's profit, if any, depends on whether it had paid less than $10 when it originally purchased the security it then sold to the State. If it had paid more than $10, it too would have a loss. Dealer Y's profit, if any, depends on whether it is able to get more than $8 when it tries to sell the security it bought from the State. If dealery sells for less, dealery too will have a loss. Either dealer's profit or loss depends entirely upon shifts in market price as it transacts business with other counter-principals.

hindsight nor did they come from old money. To be specific, the record reveals that both Mr. Margolin and Ms. Lester were upwardly mobile, middle class working persons in their mid 30's. Like so many other enthusiastic and ambitious persons before them, they tended to confuse profits in a bull market with intelligence. (Again, *see, supra*, note 8.)

A great deal of harsh law has grown up to terrorize fiduciaries into honesty and prudence. Morgan Stanley points out that notwithstanding the circuit court's conclusion that the State was "speculating" (a conclusion to which old money would immediately jump) Morgan Stanley is nonetheless entitled to a *jury* determination of whether Morgan Stanley knowingly aided and abetted the Treasury staff in violating *W.Va.Code* 12–6–12 [1978] under the facts of this case. And, although it is a close issue, we agree. *W.Va. Code* 12–6–12 [1978] defines speculation in terms of what a prudent man would do with his own portfolio; a West Virginia jury might look more like the salesmen at Morgan Stanley than the members of this Court, so the jury might conclude that Morgan Stanley and the staff of the Treasurer's office behaved reasonably at the time.[24]

The people at Morgan Stanley made a lot of money helping the staff of the Treasurer's office play the bond market, but only a jury can apportion Morgan's salesmen's actions between genuine enthusiasm and simple cupidity. Certainly the record reveals that everyone in the bond trading process at issue in this case was enthralled by his or her overall success until the bottom fell out. Young persons who have grown up in prosperous times don't expect catastrophe, which is why Wall Street's most successful blue sky salesmen are young, upwardly mobile persons who *honestly* believe that blind hogs can consistently find acorns.

At least since *Sparf v. United States, supra*, the American rule has generally been that juries have the *power* to nullify, but do not have the *right* to do so.[25] But this precious academic distinction is simply a recognition that the laws of men. cannot be applied with the same consistency or precision as the laws of physics. In the words of Morris Cohen in the 1916 issue of *The Harvard Law Review:*[26]

> We urge our horse down hill and yet put the brake on the wheel—clearly a contradictory process to a logic too proud to learn from experience. But a genuinely scientific logic would see in this humble illustration a symbol of that measured straining in opposite directions which is the essence of that homely wisdom which makes life livable.

Consequently, we would suggest that when a civil case involves law that is sufficiently obscure, tenuous and convoluted that a reasonable person could find it surprising, a court may submit the matter to a jury in order to guarantee that the judgment ac-

---

**24.** After all, if there had been a Dow Jones Index Fund in September, 1929, the prudent investor who had heavily invested in such a fund as the quintessential exercise in "modern portfolio management" would have been a hurt'n cowboy by January, 1930. Indeed, it is wonderful fun to watch young instructors in economics wax eloquent about the intersection of supply and demand curves for endless weeks in basic economics courses while spending but a bare moment discussing what happens to markets when entire curves shift right or left (as the result, for example, of war, technological innovation, shifts in taste, or price shifts in substitute goods.) In the real world, of course, rightward and leftward shifts in supply and demand functions are the primary jeopardy 'to which business is subject. Bonds can be wiped out by inflation; land values can be destroyed by depression; common stocks can be devalued by international competition that eliminates barriers to entry and destroys oligopolies; and, a "balanced" portfolio does little for a person in a country ravaged by a shooting war.

**25.** "[Juries] have the physical power to disregard the law, as laid down to them by the court. But, I deny that ... they have the moral right to decide the law according to their own notions or pleasure. On the contrary, I hold it the most sacred constitutional right of every party accused of a crime that the jury should respond as to the facts, and the court as to the law.... This is the right of every citizen, and it is his only protection." *Sparf v. United States*, 156 U.S. 51 at 74, 15 S.Ct. 273, at 282, 39 L.Ed. 343, at 351 (1895).

**26.** Morris R. Cohen, *The Place of Logic in the Law*, 29 *Harv.L.Rev.* 622, 639 (1916).

cords with the community's sense of moral probity. This seems to us to be a proper compromise between outright recognition of the propriety of jury nullification (such that a defendant would be entitled to an instruction on the subject) and a mechanistic approach to law that applies Rule 50, *WVRCP* principles with insufficient flexibility.[27]

■ Morgan Stanley also assigns error to the trial court's failure to allow Morgan Stanley to offset any *losses* that might have oc-

curred because of Morgan's aiding and abetting the aggressive trading strategy of the Treasurer's office with *profits* that were made using the same strategy. (The profits, of course, would need to come from the same type of speculation, if speculation it were.) Here we agree, and to the extent that we appear to depart from existing law in other jurisdictions, we do so intentionally and in full recognition that we are, perhaps, breaking new ground.[28]

27. In 1991 there were proposed statutes or constitutional amendments pending in seven states that would require judges to instruct jurors on their right to ignore the law and vote their consciences. Other states were considering similar legislation. *See*, M. Kristine Creagan, "Jury Nullification: Assessing Recent Developments," 43 *Case Western Reserve L.Rev.* 1101 (1993). Currently, the three states that permit jury nullification are: Georgia, Indiana and Maryland.

28. Courts have generally held that, where a trustee made several improper investments some of which resulted in a profit and others in a loss, the trustee *cannot* set off the profit against the loss. *State ex rel. Bottcher v. Bartling*, 149 Neb. 491, 31 N.W.2d 422 (1948) (citing *Restatement of Trusts*, § 213); *Pennsylvania Co. for Ins. on Lives and Granting Annuities v. Gillmore*, 142 N.J.Eq. 27, 59 A.2d 24 (1948) (citing *Restatement of Trusts*, § 213); *King v. Talbot*, 40 N.Y. 76 (1869); *City Bank Farmers Trust Co. v. Evans*, 255 App. Div. 135, 5 N.Y.S.2d 406 (1938), *reargument denied In re Sterling's Estate*, 256 App.Div. 967, 11 N.Y.S.2d 223 (1939); *Schuster v. North Am. Mort. Loan Co.*, 44 Ohio Law Abstract 577, 65 N.E.2d 667 (1942); *Cuyler's Estate*, 5 D. & C. 317 (Pa.1924); *Adye v. Feuilleteau*, 3 Swanst. 84n, 1 Cox 24 (1783); *Ex parte Lewis*, 1 Gl. & J. 69 (1819). (The rule is most strongly applied when a party seeks to mitigate damages by balancing losses against gains with respect to *different* parts of the trust property.)

When there has been a breach of trust involving successive dealings with *one* part of the trust property, however, a different rule is applied. Some cases have allowed a set off of profit against loss on the grounds that there was, in substance, a single breach of trust. *MacBryde v. Burnett*, 132 F.2d 898 (4th Cir.1942); *Jennison v. Hapgood*, 10 Pick. (Mass.) 77, 111 (1830); *McInnes v. Goldthwaite*, 94 N.H. 331, 52 A.2d 795 (1947); *English v. McIntyre*, 29 App.Div. 439, 447, 51 N.Y.S. 697 (1898); *Lacey v. Davis*, 5 Redf.Surr. (N.Y.) 301 (1882); *In re: Porter's Estate*, 5 Misc. 274, 25 N.Y.S. 822 (1893). *See Marcus v. Otis*, 168 F.2d 649 (2d Cir.1948), *reaffirmed* 169 F.2d 148 (1948).

If a trustee purchases property in breach of trust and then sells that property for a loss, it has

been held that he is accountable only for the net profit or chargeable with the net loss. *Baker v. Disbrow*, 3 Redf.Surr. (N.Y.) 348 (1878), aff'd 18 Hun. 29, 30 (1879), aff'd mem. 79 N.Y. 631. The same rule has been applied where the property was first sold at a loss and the proceeds invested at a profit. *Fletcher v. Green*, 33 Beav. 426 (1864).

Whether the trustee is allowed to offset profit against the loss primarily turns on the way the improper transactions are structured, and not explicitly on whether the breach of trust was intentional or unintentional. *Restatement, (Second) Trusts* § 213 states, in pertinent part:

**§ 213. Balancing Losses against Gains**
**A trustee who is liable for a loss occasioned by one breach of trust cannot reduce the amount of his liability by deducting the amount of a gain which has accrued through another and distinct breach of trust; but if the two breaches of trust are not distinct, the trustee is accountable only for the net gain or chargeable only with the net loss resulting therefrom.**

Our reading of the law instructs us that § 213 is the traditional characterization that allows a court to temper the wind for the shorn lamb, but in the case before us we find that simply characterizing a course of conduct as "one transaction" or "several transactions" is itself outcome determinative. What would lead to one or the other characterizations at the end of the day is the court's conclusion about whether the trustee was morally culpable or whether the trustee simply made an honest mistake. Furthermore, although throughout this case the Board of Investments and the Investment Division of the Treasurer's office have been characterized as fiduciaries, they certainly do not resemble the classic "trustees" who administer estates and trusts and around whom the classic language of the law of trusts has arisen.

*Restatement, (Second) Trusts* § 213, *Comments a and d* state:

a. *Distinct breaches of trust with respect to different parts of the trust property.* A trustee who is liable for a loss occasioned by a breach of trust with respect to one portion of the trust property cannot reduce the amount of his liability by deducting the amount of a gain which has accrued with respect to another part of the

Just as the law of property makes a distinction between innocent and willful trespassers in terms of the measure of damages that may be recovered,[29] we hold today that it is appropriate in fiduciary matters to make a distinction between innocent and willful fiduciary violations. Morgan Stanley is a major financial institution that employs thousands of honest, decent, working-class people whose call on our solicitude is in no way attenuated by the fact that they live in New York.

The record strongly suggests that Morgan Stanley never *intentionally* set out to injure the State of West Virginia, the State's political subdivisions, the State's citizens or the State's taxpayers. Nonetheless, the record also strongly suggests that Morgan Stanley did know that the people who were running the Investment Division of the West Virginia State Treasurer's office were not potential nominees for the Nobel Prize in Economics and that, from time to time, by almost anyone's standard, the West Virginia traders were engaged in rather more risky dealings than was appropriate for fiduciaries. It is for the jury to determine what effect the "trading discipline" (*see*, *supra*, note 12) that Ms. Lester told Morgan Stanley the State maintained had on Morgan Stanley's "knowing" aiding and abetting and on Morgan Stanley's overall culpability.

The record shows that Associate Treasurer Margolin told Morgan Stanley in no uncertain terms that there were lots of dealers available to trade with the State of West

---

trust property through another and distinct breach of trust.

Thus, if the trustee improperly invests part of the trust funds in securities which he sells at a profit and improperly invests another part of the trust funds in other securities which he sells at a loss, the beneficiary can accept the transaction on which there was a profit and reject that on which there was a loss; he can compel the trustee to account for the profit on the former securities and charge the trustee with the loss on the later securities.

.  .  .  .  .  .  .

*d. Breaches of trust which are not distinct.* If the trustee makes a profit and also incurs a loss through breaches of trust which are not distinct, the beneficiary is not entitled to recover the amount of the profit without deducting the amount of the loss, or to charge the trustee with the loss without deducting the amount of the profit.

**29.** It is the prevailing rule in West Virginia that an "innocent" trespasser who has acted in "good faith" mining or removing minerals from the land of another, is liable to the owner for the full value of the minerals removed, computed as of the time the trespasser converted them to his own use, *less* the expenses of extraction. *Reynolds v. Pardee & Curtin Lumber Co.*, 172 W.Va. 804, 310 S.E.2d 870 (1983); *Spruce River Coal Co. v. Valco Coal Co.*, 95 W.Va. 69, 120 S.E. 302 (1923) (coal); *Pan Coal Co. v. Garland Pocahontas Coal Co.*, 97 W.Va. 368, 125 S.E. 226 (1924) (coal; stating rule). *See also*, 21 A.L.R.2d § 3.

In Syl. pt. 8 of *Pan Coal, supra*, we ruled:
    If the trespass be committed, not recklessly, but through inadvertence or mistake, or in good faith, under an honest belief that the trespasser was acting within his legal rights, it is an innocent trespass, and the measure of damages for the coal mined and carried away is the value of the coal in place, usually to be ascertained by finding its value at the pit-mouth or loading tipple and deducting therefrom the expense of mining and carrying it to the pit-mouth or tipple. But if the trespass be wilful, in an action for the value of the coal so mined, the measure of damages is its value at the pit-mouth or loading tipple, without deduction for mining and carrying it to the place of conversion. (p. 376).

The measure of damages for a trespasser's removal of coal or other minerals depends upon whether the trespass was innocent or wilful. Syl. pt. 8, *Pan Coal, supra*. Syl. pt. 9 of *Pan Coal* states:
    In an action for the recovery of the value of coal mined by a trespasser, the damages therefor are compensatory only, whether the trespass be innocent or wilful. The disallowance of labor and expense in case of wilful trespass is not based on the ground of allowing plaintiff exemplary or punitive damages, but on the principle that one who wilfully commits a wrong is not entitled to profit thereby, while the innocent trespasser, who in good faith has improved the property, has acquired a certain right in it and is entitled to credit for the value added thereto at his expense, whenever the plaintiff asserts his right to the property. (p. 376).

*See also, Restatement 2d Torts* § 920, stating:
    **Benefit to Plaintiff Resulting from Defendant's Tort**
    **When the defendant's tortious conduct has caused harm to the plaintiff or to his property and in so doing has conferred a special benefit to the interest of the plaintiff that was harmed, the value of the benefit conferred is considered in mitigation of damages, to the extent that this is equitable.**

Virginia, and that if Morgan Stanley had scruples about what the Treasurer's office was doing, the Treasurer's office would take its business elsewhere. Morgan Stanley has families to feed and expenses to meet. To say that Morgan Stanley is a regular business suffering all the competitive pressures that are prominent in a global economy is hardly derogatory, and Morgan Stanley's seeking new customers in an aggressive manner to stay solvent is not *per se* grounds for punishing it. Certainly Morgan Stanley never undertook the duties of an insurer.

Consequently, we hold today that the law in West Virginia is that when a fiduciary (or aider and abetter) is attempting in good faith to maximize the trust estate for his, her or its beneficiary, yet *innocently* violates traditional fiduciary principles, losses that occur through innocent violation may, nonetheless, be offset by gains achieved at roughly the same time by the same type of violations. Essentially, we are simply reformulating *Restatement (Second) Trusts* § 213, Comment d in a slightly more candid and comprehensive manner. In this regard, the jury must determine that the fiduciary, or any person who aided and abetted the fiduciary, acted out of honorable motives and did not intentionally violate his, her or its fiduciary duty or intentionally and knowingly aid and abet such violation. If, therefore, the jury concludes that the fiduciary and/or any aider and abetter is entirely innocent of intentional wrongdoing, then the jury may offset losses that arose from speculation with gains that arose as a direct result of the same type of speculation.

■ Finally, Morgan Stanley argues that Morgan Stanley is not the proximate cause of the State's loss. Simply put, Morgan Stanley asserts that if Morgan Stanley had not traded with the State of West Virginia, numerous other dealers would have done so. We are not inclined to accede to this proposition because *strict* liability in fiduciary law is designed to discourage *all* third parties from knowingly cooperating with a fiduciary in the breach of a trust. It is true that if Morgan had withdrawn from trading with the State, other houses probably would have continued to trade, but the point to be made is that *no one* who was an experienced investment executive should have cooperated with the State or aided and abetted the State if, indeed, the State was "speculating" rather than "investing."

### Policy Considerations

Much of what concerns the Court in this case involves the specter of large-scale, bankrupting entrepreneurial lawsuits brought against deep-pocket defendants in fori where the plaintiffs are the home team. For more than a decade, this Court has been at the forefront in explaining the structural bias inherent in a federal system comprised of 53 freestanding court systems [30] in which every independent system has roughly the same law-making powers that the courts of England enjoyed at the time of the American Revolution. In areas of law such as product liability or securities dealers' liability where the typical profile involves: (1) an in-state plaintiff; (2) an in-state judge; (3) an in-state jury; (4) in-state witnesses; (5) in-state spectators; and, (6) *an out-of-state defendant,* it hardly requires Nostradamus to predict that the out-of-state defendant will not enjoy surpassing confidence that he is standing on a level playing field. In this profile of cases, there is potentially a competitive race to the bottom among state jurisdictions to garner for themselves whatever insurance fund is available before other jurisdictions exhaust the fund.

Furthermore, equal protection principles are largely unavailing to correct this structural problem because areas of law that involve the recurrent appearance of the "in-state plaintiff/out-of-state defendant" profile tend to be carved out of the general body of tort law for special rules, such as "absolute liability without fault" (product liability) or "no offset of profits against losses" (fiduciary liability). We have explained these matters time and time again, and we have urged the Supreme Court of the United States to make national rules in all the areas where the

---

**30.** These are the court systems of the fifty states, the state-like court systems of the District of Columbia and Puerto Rico, and the federal system. These disparate systems are only loosely held together by the Supreme Court of the United States.

competitive race to the bottom is prominent.[31]

West Virginia is a small state with severe economic problems, but we have always aspired to be a good neighbor. Although on many occasions we have had no choice but to be a part of the competitive race to the bottom, *see Blankenship v. General Motors Corp.*, 185 W.Va. 350, 406 S.E.2d 781 (1991),[32] we are not cynical; we have done our utmost to urge the Supreme Court of the United States to make national law and correct the problems of which we are necessarily a part. *Blankenship, supra; TXO Production Corp. v. Alliance Resources Corp.*, 187 W.Va. 457, 419 S.E.2d 870 (1992), *aff'd*, —— U.S. ——, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993)[33]. Furthermore, we have fallen in wholeheartedly behind the Supreme Court of the United States whenever that Court has made halting efforts at achieving national law uniformity. *Garnes v. Fleming Landfill, Inc.*, 186 W.Va. 656, 413 S.E.2d 897 (1991).

Morgan Stanley, therefore, is entitled to tell its story to a jury for many of the same reasons that the seven prelates in 1688 were entitled to tell their story to a jury. At trial, Morgan Stanley may explain to a jury what it thinks the word "speculation" in *W.Va.Code* 12–6–12 [1978] means and the jury may then, with proper instructions, determine whether Morgan Stanley's actions were within the *Code* requirement for investments, and Morgan Stanley is entitled on the issue of damages to attempt to show that it and its counter-principals in the State Treasury acted in good faith with an honest intent to benefit the fiduciary estate.

Accordingly, the judgment of the Circuit Court of Kanawha County is reversed, the jury verdict heretofore entered on the theory of constructive fraud is set aside, and the case is remanded to the circuit court of Kanawha County for further proceedings consistent with this opinion.

Reversed and remanded.

Retired Justice NEELY delivered the Opinion of the Court.

Justice BROTHERTON and Justice RECHT did not participate.

Justice CLECKLEY, deeming himself disqualified, did not participate.

Judges FOX and CANTERBURY, sitting by temporary assignment.

---

**31.** Furthermore, were the Supreme Court of the United States to undertake to make such national rules on a case by case basis, there would be an entirely wholesome mid-course correction in tort law that would preserve many of tort law's genuine contributions to a safe and just society. As it stands, however, when reform comes, it is likely to be part of a larger ideological counter-revolution that will necessarily involve wholesale mucking about by novices who never tried a case and have no idea of the balance of off-setting terrors necessary to make the system work.

**32.** *Blankenship* was an engraved invitation to the U.S. Supreme Court to review the entire product liability, competitive race to the bottom problem and begin the process of national rule-making. The defendant, alas, was not attuned either to subtlety or irony; it settled!

**33.** *See also*, R. Neely, *The Product Liability Mess: How Business Can Be Rescued from State Court Politics*, Free Press (New York, 1989), (also available in Japanese from Toshiaki Hasegawa, Tokyo, 1991).